S. PERCY GREENE *et al.*, plaintiffs in error, *vs.* JAMES H. LOWRY, defendant in error.

1. When in November, 1864, a contract was made for board for a year, and in February, 1865, a note was given for the sum agreed on, but the boarding ceased in August, 1865, and in November, 1865, the parties had a settlement, and the equities of their Confederate contract were agreed upon, the true value of the board actually received, settled, and a new note given for what was due:
*Held*, That this contract of November, 1865, was not a renewal of the note of February, 1865, and that the tax affidavit, required by the Act of October 13, 1870, was not necessary.
2. In this case we think the verdict of the jury is fully supported by the evidence, and there being no material error in the charge of the Court, there was no error in refusing a new trial.

Relief Act of 1870.   Tax affidavit.   Renewal.   Evidence. Before Judge PARROTT.   Whitfield Superior Court, April Term, 1872.

James H. Lowry brought complaint against S. Percy Greene and Julia Greene upon the following note, to-wit:

"$450.00.   One day after date, we, or either of us, promise to pay James H. Lowry, or bearer, the sum of four hundred and fifty dollars, for value received.  This Nov. 18th, 1872.
(Signed)                              S. P. GREENE,
                                        JULIA GREENE."

Plaintiff introduced the note sued on and closed.

The defendant, S. P. Greene, testified as follows, to-wit: Witness is one of the defendants.   His sisters—one grown, two children—went to board with plaintiff the last of Novem-

ber, 1863. Witness was in the Confederate army; returned home in February, 1864; while there proposed to plaintiff that they should settle the amount due for the board of his sisters. Plaintiff said he would charge only for the actual cost of the provisions consumed. Plaintiff and witness made a calculation of the cost of the provisions, for the articles, and at the price named by the plaintiff, and found the amount due for one year's board to be $1,250 in Confederate money. Plaintiff thought the amount too small; witness proposed $2,000; plaintiff being still dissatisfied, was asked how much would satisfy him; he said $2,500 would; witness agreed and gave plaintiff a due bill for that amount in Confederate money. Defendant had one negro boy about grown, who worked for plaintiff all the time; a negro man who worked one day in each week, and a negro girl who worked for plaintiff when not employed in attending on his sisters' chamber. Witness turned over to plaintiff a negro man worth $4,000, with orders to sell him and pay himself the amount due him, and use the balance in his business, subject to the order of witness or his sister. This negro was not sold, but remained in plaintiff's hands until he was emancipated. Witness went from Forsyth, where plaintiff lives, to Macon, and there gave to Colonel J. F. B. Jackson, a friend of his, who was dealing in negroes, an order to plaintiff to turn over the negro to him, with directions to Jackson to dispose of the negro and turn over the proceeds to plaintiff. The negro's name was Aleck. After the war witness told plaintiff he wished to have an adjustment of matters between them, and proposed that they should arbitrate it; but plaintiff did not agree to do so. On the day of the giving of the note sued on, witness and sister went to plaintiff's house, by his invitation, to settle the matter; and witness' sister proposed that the matter should be left to disinterested persons. Plaintiff demurred, and asked defendant what they thought they should pay him. Defendant said they did not know, and told plaintiff to say. Plaintiff said he knew that they were

Greene *et al. vs.* Lowry.

unable to pay him anything then, and did not know when they would be, and that, therefore, he would be obliged to charge them more than he otherwise would, and named the amount mentioned in the note—$450—and said that if they would give him their note for that amount they could have their own time to pay it; that he would never in any way press them for the money, but that they could pay it when they could without inconvenience to themselves. This was before witness was aware of the passage of the Scaling Ordinance of the Convention of 1865, it having been passed but a day or two before, and witness not knowing but thought he was liable for the whole amount of his due bill ($2,500), and relying on the promise of the plaintiff that he would never be pressed on the note, gave the note sued on. Witness had had the utmost confidence in plaintiff. Witness had never done any business for himself; had left college for the army, and remained in the army until the close of the war; was, when he gave the note, between twenty-two and twenty-three years of age. Witness was informed by Mr. Spriggs, who owned an adjoining farm, that plaintiff had proposed to sell him the note sued on, and told him that if he would buy it, he could compel witness to cut him off part of his farm to pay it, whereupon witness wrote to plaintiff that he considered he had broken his promise, upon which he had relied when he gave the note, and, if this was true, he would not pay the note, but proposed that they should leave the matter to arbitration, whereupon plaintiff brought suit on the note. The farm belonging to the estate of E. N. Greene, (witness' father,) is worth from $2,000 to $4,000; there are four heirs. Witness got from plaintiff, in February, 1865, some jeans to make an overcoat, also money—thinks $50 in Confederate money—to buy buttons for it. Witness was at plaintiff's house but once while his sisters were boarding there, until the close of the war; that was in February, 1865; he remained there ...... weeks, boarding at plaintiff's house; knew about the negro's working from what plaintiff told him. The

negro boy Aleck, turned over to plaintiff to sell, belonged to the estate; there had been no division of the property left in the will of witness' deceased father. Witness was the agent of his uncle, James Greene, one of the executors, to manage and control the property; does not know when the negro, Aleck, came to plaintiff's possession; this negro was in Columbus at the time, and he ordered him sent immediately. His sister, Julia, is older than he is; one or the other of them would be the head of the family; their interest in the land would not be much more than the homestead. There was some stock on the place, but not over the amount of exemption allowed by law. Witness says that the note in evidence is in his hand-writing; that it was given in settlement of all matters between the parties, and that he knew all the facts then, except what he has since learned from Colonel J. F. B. Jackson. Sometime after the note was given, he (witness) put the stamps on it and canceled them. He had never paid or offered any payment on the note; did not see plaintiff and ask him if he proposed to sell the note to Spriggs, but as soon as Spriggs told witness about plaintiff's offering him the note, he wrote plaintiff that he might sue—that he would not pay the note; considered himself released; but if he would submit it to arbitration, he would pay what the arbitrators said. Witness' recollection is, that he was admitted to the bar in October, 1867. Plaintiff came to witness' house to get him to go and see Spriggs; plaintiff wanted to raise money; witness told him Spriggs was not at home, and he (witness) did not think he had any money on hand. All the estate E. W. Greene had left at the close of the war was the farm, in a very dilapidated condition.

Defendant also introduced the answers of Miss Julia Greene to two sets of interrogatories, which are as follows, to-wit: To the first set she answers: I am one of the defendants, and sister to S. P. Greene, the other defendant; when we first went to Mr. Lowry's house we rented a room from him for three weeks, and furnished our own board dur-

ing that time; at the expiration of that time plaintiff moved into a different house; we again rented a room from him and proposed to furnish our own board, but plaintiff insisted that we should board with him; he said that he would feel better if we would, as brother was in the army; I then asked him what he would board us for; he said he would prefer making a contract with my brother when he came home; but for us to suffer no uneasiness about that, as he would charge nothing more than the actual cost; this was the only agreement we made. I have two sisters, one was fourteen years old and the other seven; I was present when a subsequent agreement was made between plaintiff and my brother, the other defendant in this cause, in relation to the board of myself and sisters; that agreement was that we were to pay him twenty-five hundred dollars in Confederate treasury notes for one year's board; there was no time mentioned at which it should be due, at least I do not recollect any; my recollection is that I was indebted to the plaintiff in the sum of three hundred dollars, Confederate treasury notes, that he loaned me about the time of the surrender; my brother was indebted to him for a jeans overcoat, bought from him about Christmas, 1864; I do not know at what price or what kind of money it was to be paid in; my brother, S. P. Greene, and myself had a conversation with plaintiff some time in the fall of 1865 with regard to the amount we were due him; we proposed to leave the matter to arbitrators to say how much we should pay him in good money; he did not accept this proposition, but said he knew our circumstances, and knew that we were unable to pay him at that time, but he wanted us to give him a note, remarking that we were all liable to die, and said that we should not be pressed for the money; I considered that I was not indebted to the plaintiff in the amount of the note sued on in good money at the time I gave it; I knew we owed him something and I felt mortified that we were unable to pay it, and I wanted Mr. Lowry to be satisfied, and I thought we would be better able to pay

Greene *et al. vs.* Lowry.

the amount the note was given for in two or three years than the half of it at that time, and Mr. Lowry promised faithfully that we should not be pressed on the note until we had ample time to pay ; these considerations were the inducements for my signing the note. I know that my brother, S. P. Greene, turned over to plaintiff a negro man about Christmas, 1864, to be disposed of by him as he thought proper and the proceeds applied to the payment of our board, and the remainder, if any, to be used by him as he desired ; the negro remained with plaintiff until set free; he was a stout, healthy negro, twenty-eight years of age; during the time that we boarded with plaintiff I had a negro girl that did his house work, a negro boy sixteen years old that worked for him, and a negro man that worked at least one day in each week for plaintiff; besides this I had on hand at the time, which I turned over to plaintiff, provisions worth $400 in Confederate notes. My brother, S. P. Greene, wrote the note sued on ; I did sign it; it was given for board ; I knew what was in the note when I signed it; I saw my brother sign it, and we agreed to pay that amount; the conversation I have testified about occurred before the signing of the note; I cannot tell when the note was stamped or who did it, as I was not present; Mrs. Lowry and her two daughters were present ; I do not know who was present when it was stamped ; the note was made at plaintiff's house ; don't know where it was stamped ; I am defending the suit because plaintiff deceived me by telling me that we should not be pressed upon the note, and I would still be willing to pay full amount if plaintiff would give the time as he promised.; the defense is an effort to reduce the amount of the note.

To the second set she answers as follows : I am a party to the suit, and I know the parties ; I and my sisters did live in plaintiff's family parts of the years 1864 and 1865; I was living with my uncle, who was connected with the hospital, which was ordered to Mississippi ; my uncle insisted that I should go with him ; I refused to go on account of

the difficulty of traveling, and I wanted my sisters to be at school; uncle finally consented for me to remain and to go to see plaintiff as to what arrangements might be made about board, etc., having understood that plaintiff was to occupy the house uncle then lived in, which was a large hotel; but plaintiff informed me that he did not intend to keep a boarding-house, but he, plaintiff, suggested the idea that I could occupy a part of the house, which fact I reported to my uncle; shortly afterward plaintiff came to the house or hotel and, in my presence, my uncle made a contract with plaintiff for me to occupy a part of said house, and have the use of an outbuilding for a kitchen; though terms were not agreed on, plaintiff said to uncle that they should be easy or words to that effect; a few days after this talk uncle moved with the hospital and plaintiff moved into the house; I did live in the same house with plaintiff for three weeks before eating at his table, occupying the rooms. About this time a raid was being looked for and plaintiff moved in haste into a smaller house, thinking it would be safer, and by invitation of plaintiff and family I moved into the same house with them; I and my sisters occupied only one small room and I intended furnishing my own provisions as in the larger house, but plaintiff said it would be very inconvenient to have two tables, as the house was small and but one kitchen, and he told me if I would agree to eat at his table it should not cost me any more than if I supplied myself; I did furnish plaintiff with two bushels of wheat, four of rye and three and a half bushels of meal or grits, a large quantity of soap, and other articles of less value. I did lend plaintiff between one and two hundred dollars shortly after commencing to eat at his table; plaintiff did return all except fifty-six dollars, one hundred dollars of which was used to pay my sister's tuition. Plaintiff did lend me about three hundred dollars in the spring, about the time of the surrender; about the same time he let me have ten yards of domestics; during the same spring I did buy from plaintiff some domestics, ten yards; plaintiff did not

Greene *et al. vs.* Lowry.

furnish me with any money of his own to pay tuition ; plaintiff did not furnish me or my sisters with any furniture except a vessel to carry water in, and that only for a short time ; I had a bedstead of my own and the usual furniture of a chamber ; sister Mary did sleep a part of the time with one of plaintiff's daughters by the request of plaintiff and wife. I did lend plaintiff's wife window curtains for her parlor, some silver and plates for her table, and other little articles. My means of support was from the labor of my negroes ; we had thirty-nine negroes outside of the lines, hiring for about five thousand dollars per annum ; the negroes I had about the house came up the country about the time I came ; I suppose I was in no greater danger of starving than the people, and in no danger of being without a home ; I could have lived without the charity of plaintiff, and did live without it; I could have boarded with my aunt, who lived six miles from Forsyth, but I preferred staying where my sisters could go to school. Plaintiff was considered of very limited means; I know nothing he had except a very small stock of goods : at the time I went to live with plaintiff I did not say anything to him about expecting my brother, for the reason that he was with Hood on his Tennessee campaign ; my brother did return to Forsyth some time in February, 1865 ; the same morning he left for his command he, brother, called me into the room where he and plaintiff were and a part of plaintiff's family, and told me, in their presence, that he wished to relate the contract, which was that he was to pay plaintiff twenty-five hundred dollars in Confederate money for one year's supply of provisions, wood, lights, etc., and in addition plaintiff was to have the services of one negro boy sixteen years old, and one day's work in each week of a negro man, and a negro girl about grown, the time she was not needed to wait on me; before my brother's return, in February, 1865, I at different times called on plaintiff to know what my proportion of the expenses would be; plaintiff would tell me not to make myself

uneasy; that he would not be hard, but would do what was right; that he preferred to make the contract with brother; he did, however, offer to take the hire of the negro boys I had in Forsyth for our expenses; the boy John furnished plaintiff with most of his firewood; by request of plaintiff and wife the boy Gus was in his service, and the girl Becky did most of their household work, besides helping in the kitchen; plaintiff had an old negro woman all the time belonging to Mrs. Wilson, and a negro for about two months who was in bad health; I do not know to whom said negro girl belonged; I do not know what he was to pay for them. Brother and myself went to plaintiff's house on purpose to make a settlement, and in the conversation brother said he thought it would be hardly right to settle on the basis of the former contract—namely, twenty-five hundred dollars in Confederate money—and plaintiff assented, and said he did not think it would be fair; brother insisted on plaintiff's saying what he thought would be right, and plaintiff insisted for him to say; Mrs. Lowry was present, and said to plaintiff " You know what you are going to do"; plaintiff said that he was aware of our circumstances; that we were broken up and not able to pay the money at present, and proposed to take a note for four hundred and fifty dollars, stating at the time that the reason for asking our note was the uncertainty of life; that he would never press us on the note, that we should have our own time and pay along as we could conveniently do so. The consideration was not talked over at that time; brother did not promise plaintiff any hogs, corn or lumber at that time. We did not express ourselves as to whether we thought the note too large or not, but gave the note. About one week after the note was given I met plaintiff in Dalton, who told me that, through ignorance, we had signed the note without stamping it, as the law required. Shortly afterwards brother told me that he had stamped the note. Plaintiff did not pay any doctor's bills for me or my negroes. The negro boy Aleck was sound so far as I know,

but when he came to Forsyth he had the signs of having been severely whipped, though not at all disabled. I do not recollect how long said boy was in plaintiff's possession; plaintiff told me he could sell the boy at any time, but he would not do it now; that he would not be in a hurry to sell. I consider that the signs of the lash would detract something from the value of the negro. I saw Mr. Jackson's letter to plaintiff, asking him to send the boy to him and he would sell him. Plaintiff said that he would not send the boy to Jackson; that he would sell him himself. The boy was no expense to plaintiff, as far as I know. I never heard plaintiff claim, at any time, to have paid a doctor's bill for me. I know that this boy was stabbed about the time of the surrender; whether before or after I do not recollect. The place where the goverment supplies were kept was near plaintiff's house, and when the enemy was near it, was opened to every one to come and take, and my negroes, with my consent, brought to plaintiff a large quantity of provisions, consisting chiefly of corn, peas and bacon, and a large lot of this corn plaintiff had ground up and brought with him to Dalton—I suppose at least thirty bushels. Mr. Wilson furnished at least a part of the provisions on the trip up. In the spring, about the last of February, 1865, plaintiff and myself and sisters moved back to the hotel, and, when the hospital returned, the post surgeon demanded of plaintiff the house. About the time uncle left me, he and myself made a proposition to plaintiff to live in his family; since that time all the propositions for this purpose came from plaintiff and family. It was understood that if it was a boarding house, and that if it could be proven that I was boarding there, plaintiff could be dispossessed; and it was said in the family that there were no boarders in the house. House rent was very cheap; at that time many good houses were unoccupied. I did answer interrogatories in this case before. I did know as much then as now, but on being further interrogated, I have stated more now than then. I did know all the facts testified to, and

I and brother did sign the note, and did promise to pay plaintiff on certain conditions. I consider that we kept that promise in good faith until plaintiff violated the conditions. There was a balance due plaintiff for provisions, according to previous contract. I and brother did agree upon that settlement, and did promise to pay it, knowing then all that we know now; but promised only on the condition and mutual understanding that plaintiff would never press us; that we should have our own time and pay when convenient. I did intend to pay the note when I signed. With us times had been very hard, but I think some part of the note would have been paid had it not been sued. It was my intention to pay the note according to the contract, which contract, or faithful promise, was broken by plaintiff by offering to sell the note, and afterwards suing on it. My reasons, moral and legal, are because the conditions upon which that promise to pay was made were violated by plaintiff; these being violated, I think it too much.

Defendant next introduced the deposition of J. F. B. Jackson, as follows, to-wit: I know the parties in the above stated case. There were arrangements made with me by S. Percy Greene about the negro. I met with defendant (Greene), I think, in January, 1865, in the city of Macon, and let Greene have some money—$300. I think he gave me a note, or rather an order to Mr. Lowry for the negro, Aleck. I sent the order to Mr. Lowry and wrote him to send the negro down; did not hear from him for a few days, and wrote him again. I don't recollect the contents of his letter fully at this time. I heard from him, but he said he would take him himself, or could sell him there, I don't recollect which. He made inquiry as to what I was to give for the negro. I was up in Forsyth shortly after the correspondence with him about buying the negro; called to see Mr. Lowry, and saw the negro; didn't examine him closely; he looked well. I told Mr. Lowry the arrangements that defendant (Greene) had made with me were to sell the negro, pay myself the

money he had got, and send the balance to Mr. Lowry to pay the board for his sisters, and to be used for their benefit; told him that Green had instructed me to take him for what I thought he was worth and pay the balance, after my money was taken out, but I had told him I would sell and give them the benefit of what he would bring. Don't recollect Mr. Lowry's exact reply; he never let me get possession of the negro. I saw S. Percy Greene in the city of Macon, I think, in January, 1865. Greene got from me $300 and gave me an order to Mr. Lowry for the negro. I was to pay myself, and send the balance of the money to Lowry for the benefit of Greene's sisters. I wrote to Mr. Lowry and sent Greene's note or order and did not get the negro, but an answer from Lowry; don't recollect the contents of the letter fully, but he gave some excuse for not sending him. The letter, I think, was dated in January, 1865. I don't recollect all the contents. I think it was in January, but it might have been early in February. He said he preferred to manage it himself. The letter, I suppose, that Mr. Lowry wrote is destroyed, as I have destroyed pretty much all of my old Confederate letters. Don't recollect that Mr. Lowry spoke of the negro being unsound. Don't recollect the exact language used by him in his excuse for not sending him down to me—for not letting me have him when I was in Forsyth—but I understood from him that I could not get him; think he said he preferred controlling the matter himself. I know nothing else to benefit the defendant. The negro looked well when I saw him. I saw the negro, but did not examine him closely. I don't think the letter is amongst any of my old papers.

The defendant next introduced the deposition of Miss Mary Greene, as follows, to-wit: I know the parties, and am sister to the defendants. I did live with my sister in 1864 and 1865. I did live parts of the years in the family of plaintiff. Plaintiff kept a very poor table indeed, and his family complained very much about the fare; said it was much worse than they were used to. We did live in the same house with plaintiff

Greene *et al. vs.* Lowry.

before eating at his table. While we boarded to ourselves our fare was not extra, but it was much better than when eating at plaintiff's table. Plaintiff did not furnish any lights. Plaintiff moved from the house where we were boarding ourselves, and we were invited by plaintiff's family into the same house with them; we did so. Sister furnished plaintiff with one or two gallons of lard, some sugar, several sacks which I suppose contained grain of some kind. I do not consider we were in any more danger of starvation or of being without a home than other people in the same town. I have no doubt we could have boarded elsewhere in town or gone to aunt Wilson's, some six miles in the country. We had had negroes hired, and our support might have been derived from their wages. Plaintiff had no visible means of support except a small store. I and my sister did go to school at the time. I asked plaintiff for money, which he had borrowed from sister, to pay my tuition, and he gave me $100. None of plaintiff's family was present at the time. I was fourteen years old; my sister was six years old. The negroes who worked were a girl who did his house work, a negro boy, Gus, (what he did I don't know,) and a negro man, John, who worked one day in each week. Plaintiff had an old negro woman; he had also a girl a short time, who was in very bad health. Plaintiff furnished us a water can for a short time for our room. We had the ordinary furniture of a chamber of our own. Sister furnished plaintiff's wife with some parlor curtains and some table ware, and some other little things. At plaintiff's daughter's request I slept with her about six months. I do not know of plaintiff's ever paying a doctor's bill for any of us. I never heard plaintiff claim to have paid any doctor's bill for us or our negroes. Plaintiff had a negro of defendants in his possession; said negro had been whipped severely, but could still support himself. Plaintiff said he could sell him at any time, but wanted to get a good price for him. The tax in kind was opened to everybody just before the Federal troops came, and our negroes brought to plaintiff's house a large

quantity of grain; plaintiff brought a part of the same grain to Dalton. Sister did buy and pay for some domestics, but how much I do not know. Mrs. Wilson furnished provisions for us on our trip home. Sister got the lard and sugar from uncle James Greene, before he left with the hospital; as to the sacks, I don't know where she got them—one or two gallons of lard and some sugar. I don't know the quantity—both of good quality. I did not conceal any fact I have now testified to, as to what brother and sister knew then or now. I don't know whether defendants have paid or offered to pay plaintiff anything or not. Defendant did not read the interrogatories of plaintiff's wife to me. I do not know whether he read them to sister or not; he did not tell me nor do I know what points he wants to prove. None present but the commissioners when my answers were written and sworn to.

Plaintiff, in rebuttal, introduced the depositions of M. E. Lowry, M. H. Swick, and H. C. Henderson, who all testified as follows : 'We know the parties ; Miss Julia Greene, one of the defendants, came to plaintiff to know if plaintiff would take her and her two sisters to board ; plaintiff at the time refused to take them, and after some persuasion consented to rent the three sisters a room in a large house which he, plaintiff, was to occupy in a day or two; plaintiff did move to the house immediately after it was abandoned as a hospital, and the three sisters were allowed to rent and occupy one room in said house for about three weeks ; at this time, which was about the 16th of November, 1864, General Sherman's army was expected to come into Forsyth, and plaintiff determined to move, and did move, into another house, thinking it would be less likely to be molested by the army if it did come. At this time Miss Julia Greene, one of the defendants, applied to plaintiff again, and insisted that plaintiff should take her and her two sisters to board, and said to plaintiff that her brother, S. P. Greene, would be at home in a few days, as she was expecting him home on a furlough about that time, and that when he did come he, S. P. Greene, would make

arrangements with plaintiff to pay him for their board, and also to board a servant girl belonging to them, for which he, plaintiff, would charge half price only of boarding one of the sisters, on condition that said servant girl should do work for plaintiff's family at times when she was not waiting on her young mistresses ; witnesses all state that none of the servants belonging to defendants ever did any working or cooking for plaintiff's family, as plaintiff had a servant woman hired at the time from another party. Witnesses all say that plaintiff's wife agreed with Miss Julia Greene, at her, Miss Julia Greene's, solicitation, to take a small servant boy she had with her, and board and clothe him for his services, and that such board and clothes were all the services of said boy were worth ; this boy and servant girl boarded at half price under the contract above named, and were all the servants who worked for plaintiff, and who belonged to defendants, until the February following, when S. P. Greene proposed to plaintiff that if he, plaintiff, would continue to board his sisters that plaintiff could have the services of his man servant John as much as one day in each week to work in the garden when gardening time came on ; these were all the servants of defendants that ever did any work for plaintiff or his family, and the contracts for their work were made as stated above, and the witnesses think that the remuneration was ample for the services rendered. As above stated the board of the three sisters and the servant girl commenced on the 16th day of November, 1864, and continued until the 6th day of August, 1865, at which time plaintiff and family landed back at Dalton, Georgia. When Miss Julia Greene and her two sisters came to board with plaintiff all the provisions they brought with them was a small quantity of corn meal, about one peck, worth about two dollars probably ; plaintiff never went to either of the defendants to get them to board with him, but one of the defendants, Miss Julia Greene, came to plaintiff twice and insisted on plaintiff's taking them to board with him before

plaintiff even consented to do so; S. P. Greene boarded with plaintiff during the time his sisters were there about five or six weeks, witnesses cannot state positively the exact time. Witnesses all know that plaintiff furnished S. P. Greene with a beautiful fine piece of grey mixed jeans, sufficient to make him a long and large overcoat, with large cape to it; also with a piece of jeans to make a vest, but they are not positive whether he furnished enough for pants or not; witnesses all know that plaintiff also furnished him with sixty dollars Confederate money with which to buy himself a set of staff buttons for the overcoat above alluded to; witnesses do not know, of their own knowledge, that plaintiff furnished S. P. Greene with any other money. In February, 1865, S. P. Greene came to Forsyth, Georgia, on furlough, and while there he told plaintiff that he, defendant, had a negro boy at Columbus, Georgia, and that he would send for him and have him brought to Forsyth, and when the negro got there he, defendant, wanted plaintiff to take charge of him, the said negro man, and sell him for the use and benefit of defendants. Some time in the month of March, 1865, the said negro came to Forsyth and was in a condition not able to do any work or service of any kind; the man said that his condition was the effect of a fall he got off a chimney in Columbus, Georgia; the man moped and creeped about the yard of plaintiff on a stick, and looked as if he was not able to do any service; witnesses all say that while he was in that condition two or three parties came to look at him, but after seeing and examining him they said he was not a sound negro and they did not want him; witnesses all say that while there, and during the time he was in the condition before mentioned, that he and another negro man had a difficulty; the sick negro received a stab in the fight which disabled him still more, and from which he did not recover until after the surrender of the armies; witnesses do not know what price defendant instructed plaintiff to ask for said negro man. Plaintiff furnished Miss Julia Greene, one of the de-

Greene *et al. vs.* Lowry.

fendants, three hundred dollars with which to buy a silk dress and one hundred dollars to pay tuition for her two younger sisters, and one hundred dollars worth of domestics, which plaintiff furnished her at her request; the children went to school, and plaintiff furnished the one hundred dollars to pay tuition as above stated; Miss Julia Greene did not profess to have any money when she came to plaintiff's to board, nor did S. P. Greene leave any money with her while there.

Mrs. M. E. Lowry says: She heard S. P. Greene say to plaintiff that he, S. P. Greene, wanted plaintiff to loan him some money, that he was out of money and needed some to go to his command; this was on the night before S. P. Greene started back to his command.

Witnesses all say that they do not know of defendant's giving any note for twenty-five hundred dollars in Confederate money or any other sum, and do not think that any such note was given, as they never heard of any such transaction; they were all present at the time the settlement was made; that it was made at plaintiff's house in Dalton, Georgia, and that the note was given by each defendant signing their own name, and after all the trouble and expense and everything had been fully talked over by all the parties; after all the matters and prices had been talked over, plaintiff remarked to defendants that they could retire to a room and consult the matter over; that he, plaintiff, wanted them, the defendants, to be satisfied before they signed the note; defendants replied, "No, we want you to be satisfied, for," said they, "you have been kind to us, and been at a great deal of trouble and expense, and we are willing to pay you for it; we are satisfied that four hundred and fifty dollars is a fair price, and we are willing to sign the note." Miss Julia Greene remarked that "plaintiff and family had been the kindest and best friends to her and her sisters she had ever met since the death of her parents." Plaintiff remarked to defendants that "if they would pay the note off by Christmas he, plain-

tiff, would deduct twenty-five dollars from the amount of the note, as he, plaintiff, was in great need of money at that time"; defendants replied that they would pay off the note as soon as possible; S. P. Greene said he would let plaintiff have some hogs for pork, some corn, and some lumber with which to enclose his lot, and would do all in his power to pay off the whole amount as soon as possible; but the defendants said they did not want any deduction made from the amount of the note; that less than the whole amount would not remunerate plaintiff for his trouble and expense; the price agreed on by plaintiff and defendants was less than the board, money advanced, trouble, etc., which plaintiff had with defendants, and the amount of the note, four hundred and fifty dollars, was cheap in greenback money for it all; witnesses did not hear plaintiff say that he would wait longer than the Christmas following the date of the note. Plaintiff sued defendants on the note in consequence of two letters which plaintiff received from defendant, S. P. Greene, in which he stated to plaintiff that if ever he got the money on the note he would have to sue for it; witnesses do not know what plaintiff charged for house rent for servants, but that item as well as all the others were spoken of in the general settlement; S. P. Greene, defendant, canceled the stamps on the note at defendant's house; this took place, as well as witnesses recollect, in June, 1866; witnesses do not recollect what S. P. Greene said at the time; he was a lawyer at that time, at least he had the title of lawyer. Plaintiff boarded Julia Greene and sisters from November 16th, 1864, until August 8th, 1865; plaintiff lived during that time at Forsyth, Georgia, except during three or four days while he was running from Forsyth to Dalton, Georgia, at which place he landed the 8th day of August, 1865; provisions of all kind were high and scarce in all that country at the time plaintiff boarded them; witnesses do not now recollect the prices of provisions, but know they were high and scarce; during said boarding a portion of Sherman's army passed near Forsyth

and destroyed a great many provisions, houses, etc.; as before stated, provisions were high and scarce, and hard to procure. Defendants justly owe plaintiff the amount of the note; they seemed perfectly satisfied with the settlement at the time it was made, and so expressed themselves unreservedly.

J. H. Lowry, the plaintiff, testified as follows: Miss Julia Greene and two sisters went to board with witness in November, 1864; S. P. Greene came home in February; witness remembers the calculation spoken of by S. P. Greene, but does not remember any due-bill being given. The negro man Aleck, spoken of by S. P. Greene in his testimony, witness did not receive until some time after Greene left Forsyth; the negro was not well when he received him, (negro said he was hurt by the falling of a chimney); witness offered negro for sale; several parties looked at him; these parties said he was not a sound negro and would make no offer for him; John Thomas was one of the parties; witness did not examine the negro particularly; the negro came to him some time in March; the negro did nothing but mope and limp about the yard; some time before he recovered he got into a fight with another negro and was badly cut or stabbed; the cut was serious but not dangerous; witness did not deliver the negro to Frank Jackson because he did not demand him; the negro was in no condition to sell or offer for sale; he, plaintiff, and Julia talked about the negro, and about sending him to sell, and she advised against it; feared the negro would run away if he heard of it, and they kept the matter very close; he knew the condition of the property of the estate, how it was situated; witness never offered to sell the note to Spriggs without the consent of defendants; never intended to sell or dispose of it without their consent; he sued the note in consequence of notes received from S. P. Greene, defendant, that he would have to sue if he got his money; at the time the note was given witness told defendant he was needing money badly, and if they would pay him by Christmas he would knock off

twenty-five dollars; they said they would pay him as soon as they could; that he had been kind to them and they did not want him to knock off anything; afterward S. P. Greene told him that some leather he promised to let him have on the note was rotten and of no use; witness paid the doctor for attending the negro when he was stabbed; some two or three weeks after the note was given witness went and bought the stamps and gave them to S. P. Greene, who put them on the note and canceled them; J. F. B. Jackson came to For-syth; witness does not remember what conversation was had between Jackson and himself; does not think Jackson de-manded the negro. Witness paid tax on the note sued on until 1869, when witness consulted Judge Walker about continuing to pay tax on it, and Walker advised him to stop paying it; witness was talking to Judge Walker about the claim and the taxes, and Judge Walker asked him if he re-garded it as a good debt, and witness told him he did not then; Walker advised him that he did not think it was ne-cessary for him to pay tax on it any longer, and witness stopped paying tax on it; he knew how the property of the estate of E. W. Greene was situated; witness stopped paying tax on the note because he did not think he would be able to collect it on account of the relief laws; that was the rea-son he did not know or believe he could collect the money.

It was admitted that the records of Whitfield Superior Court showed that S. P. Greene was admitted to practice law at the October Term, 1866, instead of 1867, as he recol-lected.

Plaintiff also introduced in evidence the will of E. W. Greene, deceased, which it is not necessary to here set forth.

The Court charged the jury as follows, to-wit:

"If the new note was given for the old one and other things, and you cannot determine how much of the new note the old one was the consideration of, then it is not a mere renewal and no affidavit of taxes would be necessary. But if the new note was given for the old note and an open ac-

count, as for services, previously liquidated, and not as an equitable adjustment, and itself a liquidation of the original value of the board, etc., then it would be regarded as a renewal, though it was a renewal of several separate debts. In that case the tax affidavit would be necessary, and you would in that case find for the defendants. Unless there is fraud, imposition or mistake, a new term cannot be added to a written instrument by oral testimony. The law rather presumes all previous oral negotiations merged in the writing, and not intended to be relied on or insisted on. But in this case you can take into consideration any promises that the collection of the note would not be pressed, together with all the other facts and circumstances, such for instance as the real value of the original consideration, the youth and inexperience of the defendants when the note sued on was made, and the influence the plaintiff probably had over the defendants or either of them, and all other facts and circumstances, in order to ascertain whether there was in this case fraud, imposition, misplaced confidence or mistake. So far as a mere promise not to sue the note is concerned, if that was all, it might be replied to by showing that the defendants notified plaintiff to sue, and that he would never get anything any other way, if the facts show that to be the case."

The Court then charged the written request of the defendants, making the additions which are contained in the brackets, as follows, to-wit:

" If the note sued on was given under a mistake of law (by both parties) as to the legal liability of the defendants, then the note does not conclude the defendants as to the amount really due by the defendants. But in this case the jury may look into all the facts and find whether anything is really due to plaintiff, and if so, how much. If the defendant, S. P. Greene, had given in February, 1865, a note or due-bill to plaintiff, payable in Confederate money, and if the note sued on was given in renewal of said note, and if at the time the last note was given, the defendants gave it under a mistake of law, (in any way induced by the conduct of the

plaintiff or the mutual mistake of both parties,) that the whole of the Confederate due-bill could be recovered by plaintiff in greenbacks or gold, then the jury may look into the whole transaction and find what was really due to plaintiff, if anything.

" If plaintiff, to induce the defendants to make the note, made any promise which he did not keep, and did not intend to keep, this (if under all the circumstances you believe it did deceive the defendants, and induced them to make the note, when otherwise they would not have done it,) would amount to such legal fraud as would authorize you to open the whole transaction, and the note would not be conclusive as to the amount due, and you would be authorized to reduce the amount to what you find justly due on the original contract between the parties. The question for your consideration is, was there any (such mutual) mistake of law, or was there any undue advantage taken by plaintiff to induce (and which did in any way induce) defendants to give the note.

" If the jury find that the note was given in renewing a debt existing before the surrender, then plaintiff cannot recover for so much of the note as is founded on a debt existing before the surrender, as no tax affidavit has been filed.

" It was plaintiff's duty to (make reasonable exertion to) sell the negro as Greene directed, (if he was under any obligation, expressed or implied, to do so.) It was his duty to deliver the negro to Jackson, (if he was under any obligation, expressed or implied, to do so,) and if he failed to do so, and defendants have suffered loss by plaintiff's refusal, then defendants have the right to set off their loss, (provided, however, that the defendants had the right under the will to sell the slaves, for they could confer no authority to sell unless they had it themselves. I have not examined the will, which is considered as read before you. Generally there must be authority shown either by the will or from the Ordinary to authorize a legal representative to sell the property of an estate.)"

Greene *et al. vs.* Lowry.

The jury returned a verdict for the plaintiff for the full amount of the note, with interest and costs of suit.

The defendants moved for a new trial upon the following grounds, to-wit:

1st. Because the Court erred in admitting the testimony of plaintiff and of his witnesses as to what the persons said who came to look at the negro Aleck with the view of purchasing him, in relation to his physical or diseased condition, said evidence having been objected to by defendants upon the trial.

2d. Because the Court erred in refusing to give in charge, without qualification, the request of defendants.

3d. Because the Court erred in the charge in relation to the necessity of the filing of an affidavit as to the payment of taxes, and upon the subject of the evidence as to said payment.

4th. Because the whole charge of the Court did not correctly give to the jury the law of the case as applicable to the testimony before them, and was calculated to mislead the jury.

5th. Because the verdict of the jury was contrary to law and the charge of the Court.

6th. Because the verdict of the jury was decidedly and strongly against the weight of evidence.

The motion for a new trial was overruled by the Court and defendants excepted and assign error upon each of the grounds aforesaid.

McCUTCHEN & SHUMATE; S. P. GREENE, represented by R. J. McCAMY, for plaintiffs in error.

The charge as to the payment of taxes was error: 32d Ga. R., 396; 34th, 330. The charge as to fraud and mistake was error: 34th Ga. R., 485; Code, secs. 2709, 3070. The verdict was unwarranted by the evidence and should have been set aside: 36th Ga. R., 56; *Ibid.*, 362.

W. K. MOORE, by brief, for defendant.

McCay, Judge.

Upon its face, as appears by its date, this contract is not within the Act of October 13th, 1870 ; but is claimed to be within it, because it is said to be a renewal of a contract made before the 1st of June, 1865. Is that so? When these parties came together, in November, 1865, to settle their transactions, they had the contract for the year's board to adjust, together with the other matters between. The contract for the board had been in reference to Confederate money and Confederate prices. The girls had not boarded, in fact, but about nine months, and three of those months had been after the war was over, when new rates and new prices must be agreed on. All this they adjusted; they settled the value of the board for the nine months on a new basis and at a new price; they canceled the old contract and made a new one. It is an abuse of terms to term this transaction a renewal of the old contract. It was wholly a new one, based, it is true, partly on the old consideration, but also based on the fact that the girls had not boarded for a year, and on the new consideration, to-wit: the board for three months after the war. We do not think this was a renewal. It was a new contract, having to a considerable extent new considerations, and- having also new parties. Indeed, we should be slow to hold that any contract made after the war, in which the equities of a Confederate contract were adjusted, and a note taken payable in United States currency for the amount agreed upon, was a renewal of the old. Surely it cannot be said that no new consideration enters into such a contract. The adjustment of the true equities of the contract is itself a large element of the contract. In this case there is much more; here is the knocking off the three months, from August to November, and the new agreement as to the three months after the war. This is not a renewal, and the tax affidavit is not required.

When this case was before this Court on a previous occasion we granted the defendants a new trial, because the de-

Greene *et al. vs.* Lowry.

fendants insisted that the note sued on was given under such circumstances as authorized them to go behind it and show that the considerations for which it was given were for less than the face of the note indicated. We did not, however, in that case adjudge that the note was given under such circumstances. The defendants offered to show facts that might lead to such an inference, and the Court rejected the evidence. In this we thought the Court erred. The parties have now been heard, and they have gone to the jury, on the trial, on the two issues presented. First, was the note given under a mistake? Were the parties when they gave it, so under the influence of the plaintiff, as that the settlement was not a free settlement of the matters between them? Second, admitting this, does it appear, from the evidence, that the note is for more than a true equitable settlement would have demanded?

The verdict of the jury for the plaintiff is sustainable if the defendants have failed to show that the settlement was not free or that it was inequitable. Our judgment is that the verdict of the jury is right under the evidence upon both points; that it is not such a verdict as this Court is authorized, under the law, to disturb. Both Mr. Greene and Miss Greene state, even now, that they have no serious complaint as to the amount; they only find fault with the act of the plaintiff in violating his promise not to sue it as soon, as by its terms he had a right to do. And even this, as it appears from the testimony, he has only done because they notified him they would never pay it except when forced to do so by law. Nor do they, either of them, pretend now, under oath, that they were at all under any improper influence. They made the settlement freely, and the amount of the note was such as they thought they were justly due to the plaintiff. If the jury were satisfied of this, (and we think there was evidence authorizing such a belief,) then they were not bound to go any further. If the parties had themselves freely gone over their Confederate transactions for 1865, and fixed what they deemed to be the amount due in United States currency,

it was not for the jury to go over it again and apply their notions of equity to it. But had the jury done this we are not prepared to say the verdict is illegal. Barber's tables is not the only rule of the value of the board, or even of the Confederate money. As is notorious, juries have very rarely settled Confederate transactions on that basis; this Court has uniformly held that it will not scan verdicts adjusting the equities between parties growing out of such transactions very closely, and, we think, under this rule, the verdict ought not to be disturbed.

Judgment affirmed.